IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO


| | | |
|---|---|---|
| W. KENT WONDERS and JUDITH A. WONDERS, as Trustees of the Wonders Family Trust of 9/13/91, | ) ) ) ) | 2 CA-CV 2003-0090 DEPARTMENT A |
| Plaintiffs/Appellants, | ) ) | O P I N I O N |
| v. | ) ) | |
| PIMA COUNTY, a body politic, | ) ) | |
| Defendant/Appellee. | ) ) | |


APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C20013005

Honorable Carmine Cornelio, Judge

AFFIRMED

Robin C. Carter, Attorney-at-Law, P.C.
  By Robin C. Carter                                                                 Tucson
                                            Attorneys for Plaintiffs/Appellants

Barbara LaWall, Pima County Attorney
  By Christopher Straub                                                              Tucson
                                            Attorneys for Defendant/Appellee

F L Ó R E Z, Judge.

¶1        Appellants Kent and Judith Wonders, as trustees of the Wonders Family Trust, appeal from the trial court's grant of summary judgment in favor of Pima County in an action the Trust brought challenging the legality of Pima County's native-plant preservation ordinance. We affirm.

¶2        The Trust is the developer of two subdivisions in Pima County—a 20.3-acre, nineteen-lot subdivision known as Critter Land I, and a 154-acre, 148-lot subdivision known as Critter Land II. Under Ordinance No. 1998-39, incorporated into the Pima County Zoning Code at chapter 18.72 (the "Ordinance"), a landowner seeking to develop land like the Trust's must choose one, or a combination, of three designated native-plant preservation methods or obtain a variance from Pima County's Board of Adjustment. *See* Pima County, Ariz., Code §§ 18.72.050 (C) and 18.72.090 (1985).

¶3        The Trust did not seek a variance, but instead, as a condition for having its subdivision plats approved, submitted a native-plant preservation plan that complied with the Ordinance. The Trust then filed a complaint for inverse condemnation and a request for declaratory judgment, alleging that the Ordinance effects a regulatory taking of its property under the Fifth Amendment to the United States Constitution and article II, § 17 of the Arizona Constitution, that the Ordinance is unconstitutionally vague, and that it conflicts with preemptive state law. The parties filed cross-motions for summary judgment, and the trial court granted Pima County's motion. On appeal from that judgment, the Trust argues the

Ordinance is preempted by state statute and results in an unconstitutional taking of its property.

**¶4** Preliminarily, Pima County argues the Trust's claims are barred by its failure to seek a variance from the board of adjustment. The trial court did not address the Trust's claim that the Ordinance is unconstitutionally vague because it concluded the Trust had not exhausted available administrative remedies. But the court did address on the merits the Trust's claim that the Ordinance constitutes a regulatory taking of its property. We conclude that the trial court correctly applied the doctrine of primary jurisdiction below, although mislabeling it as the exhaustion doctrine.

**¶5** "'The exhaustion doctrine is concerned with the timing of judicial review of administrative action.'" *Campbell v. Mountain States Tel. & Tel. Co.*, 120 Ariz. 426, 429, 586 P.2d 987, 990 (App. 1978), *quoting* 3 Kenneth Culp Davis, *Administrative Law Treatise* § 20.01, at 57 (1958). In this case, however, the Trust has not challenged any administrative action. The board of adjustment took no action because the Trust did not apply for a variance, and the Trust does not challenge Pima County's approval of its subdivision plats. Rather, the issue presented to the trial court was whether the Trust should have been required to seek a variance before challenging the Ordinance in court. This is a question of primary jurisdiction. "In contrast to the exhaustion of remedies doctrine, which governs *when* administrative action is subject to judicial review, the doctrine of primary jurisdiction determines whether the court or the agency should make the initial decision in a particular case." *Id*. The "doctrine of

primary jurisdiction is a discretionary rule created by the courts to effectuate the efficient handling of cases in specialized areas where agency expertise may be useful." *Id.* at 430, 586 P.2d at 991.

¶6        In *Campbell*, Division One of this court applied the principle set forth by the United States Supreme Court in deciding issues of primary jurisdiction between federal administrative agencies and the federal courts.

> "[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created . . . for regulating the subject matter should not be passed over. . . . Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."

*Id., quoting Far East Conference v. United States*, 342 U.S. 570, 574-75, 72 S. Ct. 492, 494, 96 L. Ed. 576, 582 (1952) (alteration in original).  Given this principle, the trial court acted within its discretion in exercising its jurisdiction to hear some, but not all, of the Trust's claims.

¶7        Among its other powers, the board of adjustment is specifically empowered to interpret zoning ordinances "when the meaning of any word, phrase or section is in doubt." A.R.S. § 11-807(B)(1).  Given this express statutory authority, we agree with the trial court

4

that the board should have an opportunity to interpret the Ordinance before any judicial inquiry into its alleged vagueness.

¶8        The board is also empowered to "[a]llow a variance from the terms of the ordinance when, owing to peculiar conditions, a strict interpretation would work an unnecessary hardship, if in granting such variance the general intent and purposes of the zoning ordinance will be preserved." A.R.S. § 11-807(B)(2). The Trust has not argued that it should be entitled to a variance. Indeed, there is no indication in the record that a strict interpretation of the Ordinance would cause the Trust to suffer an unnecessary hardship or that a variance could be granted while preserving the intent and purposes of the Ordinance. Because the Trust's contentions are general and not based on its particular circumstances, the board's expertise and development of a factual record are not necessary to deciding the purely legal issues presented by the Trust's preemption and Fifth Amendment claims. Therefore, we conclude the trial court did not abuse its discretion by addressing whether the Ordinance is preempted or constitutes a regulatory taking. We also review these issues.

¶9        The Trust first contends that the Arizona Native Plant Act, A.R.S. §§ 3-901 through 3-934 (the "Act"), preempts Pima County's Ordinance. We consider this issue de novo. *See City of Tucson v. Rineer*, 193 Ariz. 160, 971 P.2d 207 (App. 1998). When an issue affects both local and statewide interests, both the locality and the state may enact relevant laws. *See Babe's Cabaret v. City of Scottsdale*, 197 Ariz. 98, 3 P.3d 1018 (App. 1999). A state law only preempts conflicting local ordinances when the subject matter of the legislation

is of statewide concern and the state has appropriated the field. *See Winkle v. City of Tucson*, 190 Ariz. 413, 949 P.2d 502 (1997). The existence of a preemptive policy must be clear. "Absent a clear manifestation of legislative intent to preclude local control, there is no preemption." *Babe's Cabaret*, 197 Ariz. 98, ¶ 11, 3 P.3d at 1022. And, to be preempted, a municipal ordinance must actually conflict with governing state law. "'Mere commonality of some aspect of subject matter is insufficient . . . .'" *Id*., *quoting City of Prescott v. Town of Chino Valley*, 163 Ariz. 608, 616, 790 P.2d 263, 271 (App. 1989), *vacated on other grounds*, 166 Ariz. 480, 803 P.2d 891 (1990).

**¶10** In this case, the legislature has not manifested a clear intent to preclude local control over native-plant preservation. In fact, it has done the opposite. The Act expressly provides that "[t]he board of supervisors of each county is authorized to adopt and enforce ordinances not in conflict with law for the preservation of protected groups of plants." A.R.S. § 3-914. When a statute recognizes that there may be local legislation on the same subject matter, no inference of preemption is warranted. *See Rineer*, 193 Ariz. 160, ¶ 8, 971 P.2d at 210.

**¶11** The Trust contends, however, that § 3-914 actually manifests the legislature's intent to preclude or limit local regulation on the subject. It argues that, as a property owner, it has a common law or natural law right to destroy plants on its own property, that the Act "confirms" this right by not prohibiting destruction on private property, and that, because the

6

Ordinance prohibits destruction in certain circumstances, it conflicts with "the law." Therefore, it argues, § 3-914 actually invalidates the Ordinance.

¶12    We reject this argument. Not only does the plain language of § 3-914 authorize county ordinances not in conflict with the Act, but Pima County is also empowered to enact zoning ordinances that restrict common law property rights. A.R.S. § 11-802; *see also Sandblom v. Corbin*, 125 Ariz. 178, 184, 608 P.2d 317, 323 (App. 1980) (governmental body has authority to act "in derogation of common law property rights" through zoning ordinances adopted in compliance with procedural prerequisites). The Ordinance does not conflict with "the law" simply because it is a zoning ordinance, and the Trust has not argued that the adoption of the Ordinance was procedurally flawed. Nor is it important, as the Trust contends, that the Act itself is not a zoning enabling act, because Pima County's zoning authority does not emanate from the Act. *See id.* Although the Act does not prevent the destruction of native plants on private property, neither does it confirm or confer an inalienable right to do so.

¶13    Moreover, the Ordinance does not actually conflict with the Act. To conflict under a preemption analysis, a municipal ordinance must be incapable of "peaceful coexistence" with state legislation. *See City of Prescott*, 163 Ariz. at 616, 790 P.2d at 271. In other words, a conflict exists only where a statute and ordinance are mutually exclusive, so that compliance with both is impossible. *See Babe's Cabaret*. That is not the case here, and the Trust does not argue otherwise. It asserts only that the Ordinance is more restrictive

7

than the Act.  Although we agree with that assertion, we reject the Trust's conclusion that, therefore, the Act and the Ordinance conflict.  Arizona courts have long held that, where the state has not appropriated the field, local ordinances do not conflict with state law simply because they are more restrictive.  *See City of Phoenix v. Breuninger*, 50 Ariz. 372, 72 P.2d 580 (1937); *City of Tucson v. Tucson Sunshine Climate Club*, 64 Ariz. 1, 164 P.2d 598 (1945); *Rineer*, 193 Ariz. 160, 971 P.2d 207; *see also Babe's Cabaret*.

**¶14**       The Trust relies on legislative history to argue that the language used in § 3-914, authorizing ordinances "not in conflict with law," does not permit ordinances to be more restrictive than the Act.  It notes that the Arizona senate rejected a proposed amendment to Senate Bill 1086 that would have changed the proposed language of § 3-914 to read: "County boards of supervisors and governing bodies of incorporated cities and towns of this state may adopt and enforce ordinances to preserve protected groups of plants provided such ordinances are equal to or more stringent than the provisions of this chapter." *See* S. 1086, 39th Leg., 1st Reg. Sess. (Ariz. 1989); Natural Resources and Agriculture Comm., 39th Leg., Senate Amendments to S. 1086, 1st Reg. Sess., at 3 (1989).  The Trust asserts that, by not passing the amendment, the legislature "categorically considered and rejected" the possibility that county ordinances could be more restrictive than the Act.

**¶15**       We are unable to make the inference the Trust urges merely from the legislature's failure to adopt the proposed language change.  Our conclusion is bolstered by the fact that the legislature described the purposes and policies behind the Act as to:

8

> 1. Promote awareness of the uniqueness of native Arizona plants and the potential for their preservation and salvage.
>
> 2. Encourage the salvage of native Arizona plants to the greatest extent feasible by preserving their existence through and after the process of real estate development.
>
> 3. Protect native Arizona plants from vandalism, theft, over depletion and unnecessary destruction.
>
> 4. Promote the conservation of native Arizona plants.

1989 Ariz. Sess. Laws, ch. 294, § 2. Pima County's ordinance is consistent with these stated purposes.

**¶16** Next, we hold the Ordinance is not a regulatory taking of the Trust's property. The Trust argues that the Ordinance is invalid on its face under *Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001), as a taking, and *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994), as an exaction. We review the constitutionality of a zoning ordinance de novo. *See Little v. All Phoenix S. Cmty. Mental Health Ctr., Inc.*, 186 Ariz. 97, 919 P.2d 1368 (App. 1995).

**¶17** "The Takings Clause of the Fifth Amendment, applicable to the States by the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation. . . . [A] regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause." *Palazzolo*, 533 U.S. at 617, 121 S. Ct. at 2457, 150 L. Ed. 2d at 607, *quoting Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 112 S. Ct. 2886, 2893, 120 L. Ed. 2d 798, 813 (1992) (internal citations

omitted). Article II, § 17 of the Arizona Constitution provides like protection. *See Ranch 57 v. City of Yuma*, 152 Ariz. 218, 731 P.2d 113 (App. 1986) (finding reasonable use test articulated by Arizona Supreme Court in *City of Phoenix v. Fehlner*, 90 Ariz. 13, 363 P.2d 607 (1961), consistent with federal constitutional requirements). "Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors," *Palazzolo*, 533 U.S. at 617, 121 S. Ct. at 2457, 150 L. Ed. 2d at 607, which are articulated in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978).

¶18        We address only whether the Trust has been deprived of all economically beneficial use of its property.[1]  It has not presented a clear argument under the *Penn Central* factors, and, because it presented only a facial challenge to the Ordinance below, the record necessary for an analysis of those factors has not been developed. *See Lucas*, 505 U.S. at 1015, 112 S. Ct. at 2893, 120 L. Ed. 2d at 812-13 (while categorical treatment appropriate where regulation denies all economically beneficial use of land, analysis under *Penn Central* requires factual inquiry).

---

[1]Within its Takings Clause argument, the Trust also states that the monitoring provision of the Ordinance must be struck down "as a regulatory taking, as an involuntary servitude, or as a disguised development fee." The Trust does not elaborate, however, and it is unclear if the Trust intends by this statement to advance an argument beyond its assertions under *Palazzolo* and *Dolan*, which we address below. To the extent this is a separate argument, the Trust cites no authority for it; therefore, we do not consider it.

¶19    The Trust concedes that it has not been deprived of all economically beneficial use of its land if each of the two parcels is considered as a whole. Indeed, the Trust's plans include developing nineteen lots on the 20.3 acres in Critter Land I and 148 lots on the 154 acres of Critter Land II. It does not allege that the Ordinance has changed the existing zoning classifications, the number of lots allowed on each parcel, or the type or number of structures each lot will support under those classifications. Rather, it alleges only that it has been deprived of all economically beneficial use of that portion of Critter Land II, approximately thirty percent, that it designated as natural open space in order to comply with the Ordinance. It argues *Palazzolo* supports its contention that we must consider this thirty-percent portion in isolation for purposes of our analysis under the Takings Clause. We disagree.

¶20    The plaintiff in *Palazzolo* owned property near the Rhode Island coast. The bulk of his property was designated as coastal wetlands, which would have required substantial filling in order to support any significant structure on the portion of the property so designated. Applicable regulations prohibited filling the property without a "special permit" from the Rhode Island Coastal Resources Management Council, which had refused plaintiff's request. A small portion of the property (the "upland" portion), however, could have supported at least one residential structure without any fill. Because the plaintiff was able to build a residential structure of significant value on this portion of the property, the Court affirmed the trial court's determination that the plaintiff had not been deprived of all beneficial use of his property. The plaintiff argued that, because the upland parcel was

11

distinct from the wetlands portions of his land, he should have been permitted to assert a deprivation limited to the latter. But the Court did not consider this argument because it had not been raised below. 533 U.S. 606, 121 S. Ct. 2448, 150 L. Ed. 2d 592.

¶21 We assume the Trust bases its similar argument, which it did raise below, on the Court's recognition in *Palazzolo* that it has elsewhere "expressed discomfort" with the "rule" it set forth in earlier cases that "the extent of deprivation effected by a regulatory action is measured against the value of the parcel as a whole." *See Palazzolo*, 533 U.S. at 631, 121 S. Ct. at 2465, 150 L. Ed. 2d at 616. However, despite its expressed "discomfort," the Supreme Court nonetheless recognized and applied that "rule" in *Palazzolo*, and we apply it here. Moreover, the Trust has cited no case applying to a similar regulation the alternative analysis they urge us to employ here.

¶22 The only other case the Trust has cited in support of its argument is readily distinguishable. In *Corrigan v. City of Scottsdale*, 149 Ariz. 553, 720 P.2d 528 (App. 1985), *vacated on other grounds*, 149 Ariz. 538, 720 P.2d 513 (1986), a city zoning ordinance defined a perimeter within which no development could occur. The ordinance divided the plaintiff's contiguous property into two separate zones. All land within the "no development" area was to be used solely for conservation of open space and legally secured for such conservation by easement or dedication. We have no similar circumstance here. Further, in *Corrigan* the city had recognized that compensation was required and had awarded property owners "density credits" based on the amount of each owner's land that fell within the

12

conservation zone. The court determined that the density credits there did not constitute just compensation. *See id.*

**¶23** Neither *Corrigan* nor *Palazzolo* supports the Trust's contention that we should consider only the thirty-percent portion of land set aside for natural open space in determining whether it has been deprived of all economically beneficial use of its land. When each of the two parcels is viewed as a whole, the Trust clearly is able to make beneficial use of its land, and we therefore conclude no regulatory taking has occurred.

**¶24** Finally, the Trust argues that the Ordinance is an invalid exaction under *Dolan*. In *Dolan*, the Supreme Court recognized that, "[u]nder the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government." 512 U.S. at 385, 114 S. Ct. at 2317, 129 L. Ed. 2d at 316. In *Dolan*, the plaintiff had applied for a permit to enlarge her store and expand a paved parking area. The city conditioned the permit on the plaintiff's dedication of portions of her property for public use. The Court found that, for such a condition to be valid, there must be an "essential nexus" between the city's legitimate interest and the anticipated effects of development. *Id.* at 386-87, 114 S. Ct. at 2317-18, 129 L. Ed. 2d at 316.

**¶25** The Arizona Supreme Court, however, has held that "*Dolan* applies to 'a [municipality's] *adjudicative* decision to impose a condition tailored to the particular circumstances of an individual case' but not to 'a generally applicable *legislative* decision.'"

*GST Tucson Lightwave, Inc. v. City of Tucson*, 190 Ariz. 478, 486, 949 P.2d 971, 979 (App. 1997), *quoting Home Builders Ass'n of Cent. Ariz. v. City of Scottsdale*, 187 Ariz. 479, 486, 930 P.2d 993, 1000 (1997). Further, unlike *Dolan*, this case does not involve any required dedication for public use. The Ordinance does not prohibit the Trust from exercising its right to keep others off its property. We find the requirements set forth in *Dolan* inapplicable to this case.

**¶26**        The judgment of the trial court is affirmed.


                                             _____
                                             M. JAN FLÓREZ, Judge

CONCURRING:


_____
J. WILLIAM BRAMMER, JR., Presiding Judge


_____
JOSEPH W. HOWARD, Judge

14